UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 22 CR 574-3 |
| v. | |
| CORRIE SINGLETON | Judge Robert W. Gettleman |

### GOVERNMENT'S SENTENCING MEMORANDUM

For over a year, defendant and his nine co-defendants terrorized the south suburbs of Chicago by repeatedly committing brazen armed robberies of armored trucks in broad daylight. Although defendant is charged with committing only one of those robberies, that robbery is one of the most blatantly dangerous and violent.

On October 31, 2022, in the middle of a Monday morning, defendant Corrie Singleton violently robbed an ATM and armored truck. He pointed a loaded firearm at an armed courier's head, risking a public shootout, while his co-conspirators emptied an ATM of over $100,000. Defendant dragged the courier across a parking lot and stole over $900,000 from an armored truck. He then fled the scene in a stolen vehicle as law enforcement pursued him at high speeds. While fleeing, defendant lost control of the vehicle and crashed into another vehicle, seriously injuring the other driver. While the actual robbery lasted mere minutes, in that short time, defendant not only nearly killed an innocent driver and terrorized a courier simply doing her job, but he put every person who happened to be nearby at risk.

The gravity of defendant's actions, as well as the need to protect the public and deter defendant and others from similar conduct, warrant a significant sentence. The

government requests that the Court sentence defendant to 17 years' imprisonment. In recognition of defendant's youth, his relatively limited criminal history, and the possibility of rehabilitation, this requested sentence is slightly below defendant's Guidelines range. But this request should not be taken to minimize defendant's abhorrent conduct or the need for a custodial sentence appropriate for his crime. A 17-year sentence—and no less—will provide justice for his victims and is sufficient but not greater than necessary to satisfy the goals set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

## I.      PROCEDURAL HISTORY

On July 9, 2024, an indictment was returned charging defendant with conspiracy to commit Hobbs Act robbery (Count One), Hobbs Act robbery (Count Two), and brandishing a firearm during a crime of violence (Count Three). Dkt. 182. On January 10, 2025, defendant pleaded guilty to Counts Two and Three. Dkt. 241.

## II.     GUIDELINES CALCULATIONS

The government has no objections to the PSR prepared by the United States Probation Office ("Probation") and agrees with the offense level, criminal history, and advisory Guidelines calculations therein. Specifically, the government agrees with Probation that the total offense level is 33. PSR ¶ 45. The government also agrees with the criminal history calculations set forth in the PSR (PSR ¶ 52), and asserts that defendant has zero criminal history points, and his criminal history category is I.

With a total offense level of 33 and a criminal history category of I, the advisory sentencing guidelines range is 135 months to 168 months on Count Two, in addition

2

to any supervised release, fine, and restitution the Court may impose. PSR ¶ 117. Defendant is also subject to a mandatory minimum sentence of 84 months on count Three, which must be served consecutively to the sentence imposed on Count Two. *Id.* ¶ 118.

## III.   THE SECTION 3553(a) FACTORS SUPPORT A SENTENCE OF 17 YEARS' IMPRISONMENT

The Sentencing Guidelines provide a starting point and initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Here, the Guidelines range is high. But it is high for a reason. It is high because defendant stole an extraordinary amount of money. It is high because defendant committed an extremely violent and dangerous crime that put several innocent lives in peril. It is high because defendant caused serious injuries to the driver of the vehicle he crashed into. In short, the Guidelines range is high, but a sentence of 17 years, near the Guidelines range, is appropriate given defendant's complete disregard for human life, the emotional and physical pain he inflicted upon his victims, his escalating criminal behavior, the need to protect the public, and the need to deter defendant and others from committing similar offenses.

### A.   The Nature and Circumstances of the Offense Justify a Significant Sentence

The seriousness of defendant's offense cannot be overstated and alone warrants a significant period of incarceration. Along with his co-conspirators, defendant robbed an armed armored truck courier at gunpoint. "A robber with a loaded gun . . . places lives at risk because of the prosect that, should the need or impulse arise, he will commit murder." *United States v. Ray*, 21 F.3d 1134, 1141 (D.C.

Cir. 1994). By brandishing a firearm, a robber "has empowered himself to turn the scene violent at will." *Id*. "His threat not only magnifies the chances that he will do just that if anyone gets in his way but also increases the likelihood of a violent response." *Id*. As the Seventh Circuit noted, offenses involving guns are categorically more dangerous than others: "Once the gun is in the defendant's hands he need only pull the trigger, an act which can be completed in a split second and which is controlled and influenced by nothing more than the defendant's whim." *United States v. Mathews*, 520 F.3d 806, 809 (7th Cir. 2008) (quoting *United States v. Lane*, 267 F.3d 715, 718 (7th Cir. 2001)).

Here, defendant's armed robbery epitomizes the risk described by the Seventh Circuit. It was a high-stakes, high-reward robbery, and defendant willingly risked getting into a deadly shootout for the possible windfall of over $1,000,000. On Monday, October 31, 2022, in broad daylight on a weekday morning, defendant, co-defendant Darrell Singleton, and Minor J.H. drove to the Chase Bank in Lansing in a stolen Dodge Charger. PSR ¶ 10; Dkt. 241 at 3. The Chase Bank is in a crowded shopping plaza just off Torrence Avenue in Lansing. Other businesses in the plaza include a nail salon, a martial arts studio, a Dollar Tree, a restaurant, and a children's play area called Jump N' Jam Playland.

A courier with a ballistics vest and a firearm in a holster on her waist was servicing an ATM in the parking lot of the Chase bank. PSR ¶ 10-11; Dkt. 241 at 3. Despite the very real possibility of a shootout and the presence of several innocent bystanders nearby, defendant and his co-conspirators ran up to the courier with

loaded guns and defendant pointed his gun directly at her head. *Id.* While defendant pointed a gun at the courier's head and threatened to shoot her, Darrell Singleton removed the courier's firearm. PSR ¶ 11; Dkt. 241 at 3. Minor J.H. and Darrell Singleton then removed over $100,000 from the ATM. *Id.*

Four videos of this terrifying robbery will be provided to the Court as Exhibits A, B, C, and D. As shown in Exhibit D, a cell phone video taken by a bystander, innocent customers were only a few feet away watching the robbery in horror. Below is a screenshot from Exhibit D, the bystanders' cell phone video. Defendant is in the black sweatshirt callously pointing a gun directly at the courier's head.



The more than $100,000 in the ATM was not enough for defendant and his accomplices. This was a premeditated robbery, and they knew that there was even more cash in the armored truck. After they emptied the ATM, defendant, while still pointing a firearm at the courier's head, forcefully dragged the courier to the armored truck by her vest. PSR ¶ 11; Dkt. 241 at 3. He and his co-conspirators then forced the courier to unlock the armored truck and remove cash from the rear of the truck. *Id.* Below is a screenshot from Exhibit C of Darrell Singleton forcing the courier to hand over additional bins of money in the armored truck. Defendant was right behind Darrell Singleton taking the bins of money to the Charger.



Defendant's actions had a significant impact on the courier. As reflected in her statement, the courier was not only terrified during the robbery, but afterwards she was scared to do her job, a job she once loved. Dkt. 265 at 3. It is difficult to imagine

the trauma of having a gun shoved in one's face while merely doing one's job, but the courier now must live with that trauma every day because of defendant's actions.

After loading the money into the stolen Charger, defendant and his co-conspirators fled the scene with defendant driving. PSR ¶ 12; Dkt. 241 at 4. Police officers quickly located the stolen Charger and pursued defendant. Rather than slowing down and complying, defendant led law enforcement on a high-speed chase through suburban Lansing. *Id.* Near an interstate entrance ramp, defendant attempted to merge onto the highway but lost control of the Charger and crashed head on into the vehicle of an innocent bystander. *Id.* The damage to the other vehicle caused a total loss, and the driver of the other vehicle suffered a serious knee injury which required surgery. *Id.* Defendant and J.H. were detained at the scene, but defendant's brother, Darrell Singleton escaped by jumping off an overpass. PSR ¶ 12. He was later arrested and indicted, along with defendant.

A search of the stolen Charger revealed $1,025,956 in cash that was stolen during the robbery and three firearms, one of which had a selector switch attached to it, making it fully automatic. PSR ¶ 13. In his plea agreement, defendant admitted that the three firearms found inside the Charger were the firearms he and his co-conspirators used during the robbery. Dkt. 241 at 4. The use of a gun with a switch further exacerbates the dangerousness of this crime. Switches are capable of emptying a standard magazine within seconds, often with little to no ability to control the firearm as it is firing. *See United States v. Hixson*, 624 F. Supp. 3d 930, 935 (N.D. Ill. 2022) ("[W]hen the trigger of a Glock with an attached Glock switch is depressed,

7

the firearm can empty a standard magazine in about two seconds. The resulting weapon can be difficult to control and is extremely dangerous, which can result in pray and spray.") (internal citations omitted). *See also United States v. Brooks*, 100 F.4th 825, 839-40 (7th Cir. 2024) ("the gun's modification created an extremely dangerous weapon that enhanced its killing potential. With the switch, the Glock was not only more difficult to control, but now able to fire multiple bullets instantaneously, making it more likely that innocent bystanders could be killed.") (internal citations omitted). Here, had a shootout occurred, defendant and his co-conspirators would likely have sprayed bullets uncontrollably, putting multiple innocent bystanders in grave danger.[1]

Defendant's crime was brazen and violent. Motivated only by his own greed, defendant showed a complete disregard for human life. His actions left the courier, and several innocent bystanders traumatized, and the innocent driver with a seriously damaged knee and a totaled car. The driver knew how close she came to death and stated that she was "grateful to be alive and that she did not get harmed more than she was." PSR ¶ 15.

A significant sentence is necessary to ensure that defendant never again commits a violent crime and puts innocent lives at risk. When considering only defendant's extreme conduct in this case, a sentence within the advisory Guidelines range would be easily justifiable.

---

[1] Indeed, in a later armed robbery charged in this conspiracy, defendant's co-conspirators did get into a shootout with an armed armored truck guard. Defendant was in custody at the time of that robbery.

**B.      A Significant Sentence is Necessary to Afford Adequate General Deterrence**

"Sentencing judges must consider, among other things, the need for a sentence 'to afford adequate deterrence to criminal conduct.'" *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023), quoting 18 U.S.C. § 3553(a)(2)(B). "The idea of general deterrence, put simply, is that the longer the sentence, the more it will discourage similar criminal conduct by others." *Id.*

A significant sentence is warranted here to afford adequate deterrence for the public. Defendant's robbery was part of a series of premeditated armed robberies of armored trucks and ATMs in the south suburbs that garnered significant media and social media attention. It is important to send a message to the community that although robberies of ATMs and armored trucks may hold the allure of being highly lucrative crimes, they carry stiff consequences that outweigh any prospect of personal gain. "General deterrence is, after all, an economic theory of punishment: 'Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence." *Arroyo*, 75 F.4th at 708, quoting *United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008). Unlike an impulsive shooting resulting from an argument, armed robberies are pre-planned and lucrative—in just a few minutes, defendant and his co-conspirators stole over $1,000,000— and a significant sentence will deter future potential robbers who may believe the risks of such a robbery are worth the potential reward.

9

### C. A 17-Year Sentence Will Address Defendant's History and Characteristics While Providing Just Punishment, Affording Adequate Specific Deterrence, and Protecting the Public

Defendant's history and individual characteristics offer both aggravation and mitigation. The third superseding indictment in this case charges defendant and nine co-defendants with conspiring to commit Hobbs Act robbery, including 11 robberies and one attempted robbery that occurred between October 2022 and November 2023. Defendant was the first defendant to be arrested, and the subsequent 10 robberies and one attempted robbery occurred while he was in custody. Many of his co-defendants, including defendant's two brothers, are charged with committing multiple robberies and the robberies continued to occur despite more and more members of the conspiracy being arrested and detained. If defendant was not arrested immediately following the robbery on October 31, 2022, there is no telling how many more robberies he might have committed.

Although this is defendant's first criminal conviction, defendant was on pretrial release for retail theft and aggravated unlawful use of a weapon when he committed the instant offense. PSR ¶¶ 54-55. In both instances, defendant provided law enforcement with a fictious name and date of birth. *Id*. Defendant's aggravated unlawful use of a weapon arrest stemmed from defendant standing outside a gas station wearing all black with a black ski mask (like he wore during the instant robbery) with a firearm in his jacket pocket. *Id*. ¶ 55. As Probation noted, defendant may have intended to commit an armed robbery of the gas station but was thwarted by law enforcement. Prob. Rec. Ltr. at 2. It is extremely concerning that at just 21

years old, defendant's criminal history escalated rapidly from theft, to possession of a firearm to be possibly be used in an armed robbery of a gas station, to armed robbery of an ATM and armored truck.

It is clear from his disciplinary history that defendant has not used his time in custody to reflect on his choices and make better decisions. Since his arrest, defendant has received citations for disobeying an order, battery to another inmate, horseplay, disorderly conduct, and refusing to lock down. PSR ¶ 8. Defendant was also found in possession of a cigar shaped tube, believed to be used to smoke something, and homemade liquor. *Id.*

When considering only the aggravating factors in relation to defendant, a sentence within the Guidelines range is clearly warranted. Defendant's history does, however, offer some mitigation, which weighs in favor of a 17-year sentence, which is slightly below the low-end of the advisory Guidelines range. He was young when he committed this crime, and until the age of 17, he largely avoided criminal conduct. PSR ¶ 57. He also had a difficult childhood. His father has been incarcerated for violent crimes since defendant was four, and defendant grew up in violent neighborhoods without financial stability. PSR ¶ 59-65. Troublingly, he was also directly exposed to the danger of guns at a young age. When he was 16 years old, he was shot, and his best friend was murdered in the same incident. This traumatic incident, as well as defendant's difficult childhood, certainly factored into defendant's choice to commit dangerous, violent crimes. But, as Probation noted, defendant "has himself been the victim of gun violence and it is unconscionable to this officer how

11

somebody who has been a victim of it could place others in fear of being similarly victimized." Prob. Rec. Ltr. at 3.

Ultimately, defendant's youth and relatively limited criminal history does offer some mitigation and a potential for turning his life around. This mitigation warrants a sentence of 17 years. But it does not warrant the 14-year sentence proposed by Probation. Defendant's escalating criminal history, coupled with his behavior while in custody, raises a significant concern that defendant will recidivate upon his release. Defendant was just 21 years old when he committed the instant offense and will be 23 years old at the time of his sentencing. According to the United States Sentencing Commission's report *Youthful Offenders in the Federal System*, youthful offenders have the highest recidivism rate of all federal offenders, with defendants sentenced between ages 21 and 25 having a 65.6% recidivism rate.[2] Because of the significant risk that defendant will return to criminal activity upon his release at a relatively young age and the need to ensure he ages out of his dangerous criminal conduct, a sentence of 17 years is needed in order to adequately deter defendant.

For the reasons set forth above, a sentence below 17 years would send the wrong message to defendant, society, and the victims.

## IV. COMPARITIVE CULPABILITY

As discussed above, defendant and nine co-defendants are charged in this case with 11 robberies and one attempted robbery that occurred between October 2022

---

[2] United States Sentencing Commission, *Youthful Offenders in the Federal System* (May 25, 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf, at 49 (last accessed April 18, 2025).

12

and November 2023. While the robberies followed a similar *modus operandi*, each robbery was unique in the danger it posed to victims and each defendant's role in the robberies and history and characteristics are also unique. The government will assess each defendants' culpability individually at their respective sentencings.

In contrast to many of his co-defendants, defendant has a limited criminal history and has only been charged with one armored truck robbery. This fact offers some comparative mitigation. Defendant's robbery, however, was among the most violent, and defendant's actions directly led to serious injuries to an innocent victim. Defendant was not merely a getaway driver, he was quick to approach the courier with a gun drawn and make threats, and when he did drive the getaway car, he severely injured an innocent driver in a crash while attempting to evade law enforcement. Here, defendant's conduct is serious enough to warrant a 17-year sentence.

## V.    SUPERVISED RELEASE

The government agrees with Probation's recommendation that the Court impose a period of supervised release of four years. The government agrees with the supervised release conditions set forth in the PSR, which are narrowly tailored to facilitate supervision by the probation officer, deter the defendant from future crimes, support defendant's rehabilitation and reintegration into the community, and ensure that he is engaged in lawful pursuits rather than criminal activity. Given defendant's history and characteristics, his offense conduct, and the purposes of sentencing set forth in 18 U.S.C. §§ 3553 and 3583, the government joins Probation in requesting

13

that the defendant be required to comply with the conditions of supervised release set forth in the PSR.

## VI. RESTITUTION

Pursuant to 18 U.S.C. § 3663A, restitution is mandatory in this case. In his plea agreement, defendant agreed to pay restitution in an amount determined by the Court at sentencing. The government is requesting that defendant be ordered to pay $45,586.75 to State Farm for the damage to the stolen Dodge Charger and $6,082.78 to Brink's for the firearm stolen from the courier and investigative costs incurred by Brink's. The $121,824 stolen from Chase Bank and the $904,132 stolen from Brink's were previously remitted to Chase Bank and Brink's respectively.

## VII. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to 17 years' imprisonment, to be followed by four years of supervised release. Such a sentence is sufficient, but not greater than necessary, to satisfy the 18 U.S.C. § 3553(a) sentencing factors.

Respectfully submitted,
ANDREW S. BOUTROS
United States Attorney

By: */s/ Simar Khera*
SIMAR KHERA
ELIE ZENNER
KIRSTEN MORAN
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604